UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELVIN CHARLES ESMAY, | No. C 06-863 MHP (pr) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| D. L. RUNNELS, warden, | |
| Respondent. | |

## INTRODUCTION

Elvin Charles Esmay, a prisoner at the High Desert State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

In this habeas action, Esmay challenges a 2003 conviction from Santa Clara County Superior Court. Following a jury trial, Esmay was convicted on one count of second-degree robbery (Count 1), six counts of false imprisonment (counts 2-7), one count of being a felon in possession of a firearm (count 8), and one count of second degree burglary (count 10). The jury also found true the allegations that he used a firearm in the commission of the robbery and false imprisonment crimes (i.e., counts 1-7). Esmay waived his right to a jury trial on the prior conviction allegations and the judge found true the allegation that Esmay had suffered a prior robbery conviction. He was sentenced to a total of 42 years and 4 months in prison. This sentence was comprised of the upper term of 10 years on count 1,

plus 10 years for the use of a firearm on count 1, plus 2 years and 8 months on each of the counts 2-7 (i.e., the middle term of 2 years doubled with 1 year and 4 months of that stayed)) plus 4 years on count 8 (to run concurrent), plus 1 year and 4 months on count 10 (i.e., the middle term with 2 years and 8 months stayed), plus a consecutive 5-year term for the prior robbery conviction.

The legal issues presented in this case are largely independent of the facts of the crimes. The facts of the crimes are described in the California Court of Appeal's opinion and are only briefly summarized here: On May 22, 2001, the Department of Motor Vehicles office in San Jose was burglarized in the middle of the night. When the manager arrived the next morning, she noticed that the safe deposit box had been moved, but was still locked. On June 5, 2001, Esmay and Joseph Cruz robbed the DMV office by forcing their way in at gunpoint shortly before 6:00 p.m. Esmay detained some employees at gunpoint while another employee went with Cruz to open the safe. After bags of money were retrieved, Cruz ordered all seven employees into the bathroom while Esmay waved the rifle back and forth. They left and the employees stayed in the bathroom until about 10:00 p.m. Cruz and Esmay were arrested four days later in Gilroy, in the same green van they had been observed in at the DMV office on June 5. Police officers found them transporting items between the green van and a white station wagon. Officers searched the green van and white station wagon and recovered about $15,500 in cash, a small baggie containing cocaine and some narcotics paraphernalia. Both Esmay and Cruz gave videotaped confessions several hours after they were arrested.

After his unsuccessful efforts on direct appeal, Esmay filed a federal petition for writ of habeas corpus. This court determined that the allegations of federal constitutional violations were cognizable in a federal habeas action and ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and petitioner filed a traverse. The matter is now ready for a determination on the merits of the petition.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

3

1 decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at
2 413. "[A] federal habeas court may not issue the writ simply because that court concludes in
3 its independent judgment that the relevant state-court decision applied clearly established
4 federal law erroneously or incorrectly. Rather, that application must also be unreasonable."
5 Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask
6 whether the state court's application of clearly established federal law was "objectively
7 unreasonable." Id. at 409.

**DISCUSSION**

A.  Involuntary Confession Claim

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. See Blackburn v. Alabama, 361 U.S. 199, 205-07 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. See Miller v. Fenton, 474 U.S. 104, 116 (1985). Absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment. See Colorado v. Connelly, 479 U.S. 157, 167 (1986). The court must consider the effect that the totality of the circumstances had upon the will of the defendant. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)).

A statement is involuntary if extracted by any sort of threats or violence, or obtained by any direct or implied promise or by the exertion of any improper influence. See Hutto v. Ross, 429 U.S. 28, 30 (1976). But this does not mean every statement made in response to a promise made by law enforcement personnel is inadmissible; rather, the "promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." Leon Guerrero, 847 F.2d at 1366. For example, a promise to inform the prosecutor about a

4

suspect's cooperation -- even if accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect -- does not render the suspect's subsequent statements involuntary.  See id.

Esmay contends that the statements he made should have been suppressed because they were involuntary.  He contends they were involuntary because he was under the influence of narcotics, had been handcuffed to a table and deprived of sleep for several hours, and the police impliedly promised him leniency.

After holding a pretrial hearing on the matter, the trial court found that, under the totality of circumstances, the statement was freely and voluntarily made and therefore admissible.  RT 62-63.  The California Court of Appeal rejected Esmay's involuntary confession claim and found that the trial court did not err in determining that the confession was voluntary and therefore admissible:

> The evidence that defendant was under the influence of narcotics at the time of the interview was not strong.  The arresting officer did observe symptoms that defendant was under the influence of a controlled substance at around 2:30 a.m., the time of his arrest.  However, the interview did not begin until more than eight hours later, at about 11:00 a.m.  The interviewing officer did not observe anything to indicate that defendant was still under the influence.  "[H]e seemed fine to me.  He was answering the questions directly and coherently."  After viewing the videotape of defendant's confession, we agree that at the time defendant was interviewed there were no signs that he was under the influence of any drugs.  He was generally able to "comprehend and answer all the questions that were posed to him."  (People v. Jackson (1989) 49 Cal.3d 1170, 1189; see also People v Breaux (1991) 1 Cal.4th 281, 301.)
>
> Similarly, the evidence does not support defendant's claim that his lack of sleep affected his decision to confess.  Officer Korba did not believe that defendant's lack of sleep affected his behavior, and our review of the videotape finds support for this testimony.  Defendant was coherent and awake during the entire interview.
>
> Although defendant had been handcuffed to the table prior to the interview, he was not handcuffed during the interview.  Moreover, he was allowed to eat, drink, and use the bathroom during the time he was in custody prior to the interview.  In light of defendant's experience with the criminal justice system, this factor does not weigh strongly in favor of rendering his subsequent confession involuntary. [Citation.]
>
> We also find that the record does not support defendant's claim that his confession was motivated by Officer Korba's implied promises that defendant would be treated more leniently if he confessed. [Citation.] Officer Korba told defendant that Cruz was claiming that the DMV burglary was defendant's idea.  He told defendant that he was trying to determine "the truth" about whether defendant had talked Cruz into committing the burglary, or vice versa.  At that point, defendant claimed that Cruz had planned the burglary, and he confessed.

5

> Defendant's claim that Officer Korba's statements amounted to implied promises that defendant would be charged with lesser offenses if he confessed lacks merit. Defendant himself admitted that he knew that the district attorney, not the police, makes the decision regarding what charges to file. Officer Korba's statements amounted, at most, to "'mere advice or exhortation by the police that it would be better for the accused to tell the truth.'" [Citation.]
>
> Considering the totality of the circumstances, it is clear that defendant's confession was voluntary. There was no police coercion here. Officer Korba spoke to defendant in a calm, non-accusatory tone of voice. He administered the Miranda advisements and then asked defendant if he wanted to "talk about your side of the story." Defendant said, "Yes." Officer Korba asked defendant to talk about what happened on June 5. When defendant said he did "not even know what to tell you about it," Officer Korba stated, "Well, you do not have to tell me anything if you do not want to." Defendant expressed no reluctance to talk. When Officer Korba told defendant that Cruz was claiming that the burglary was defendant's idea, defendant claimed the burglary had been Cruz's idea, and he confessed. Defendant's knowledge of his right to cut off questioning, and his ability to do so, is demonstrated throughout the interview. For instance, when Officer Korba questioned defendant regarding specific details of the bags of money, defendant indicated he was uncomfortable answering. Officer Korba told him that he did not have to answer. Later, when defendant indicated he did not want to answer questions about distinctive markings on his van, his request was respected.

Cal. Ct. App. Opinion, pp. 10-12 (citations omitted).

The California Court of Appeal identified the correct "totality of circumstances" standard and reasonably determined that the confession was not involuntary. That court, which had the benefit of reviewing the videotape which is not in the record before this court, made the finding that there were no signs that he was under the influence of any drugs during the interview. Cal. Ct. App. Opinion, p. 10. Esmay has not provided evidence to overcome the presumption of correctness that attaches to that factual determination. See 28 U.S.C. § 2254(e). Esmay points to testimony by CHP officer Larios who transported him to the CHP station, but that testimony was given in the middle of trial, see RT 366-373, and not during the preliminary hearing where it was determined whether the confession was involuntary. Also, officer Larios transported Esmay to the CHP station several hours before the interview even began; not only was there a passage of several hours before the interview began, Esmay was fed and allowed to use the bathroom. The state court did not err in finding that his will not overcome by the influence of narcotics.

The other physical conditions also do not support a finding that Esmay's will was overcome and his confession was involuntary. He was handcuffed to a table, but that ended

before the interview began. Once the interview began, the physical restraints were removed. Esmay had been handcuffed to the table because the CHP station didn't have holding cells available. Detaining a person in a more public meeting room seems less coercive than isolating him in a small cell. He did not sleep between his arrest at 1:00 a.m. and his interview ten hours later, but there was no evidence that any police officer took any affirmative steps to keep him awake during that time. He was fed and he was allowed to go to the bathroom twice during the several hours he was handcuffed to a table in the meeting room. The interview was brief – it lasted only thirty minutes. The officer provided undisputed testimony that Esmay appeared clear-headed and not confused during the interview. The physical conditions did not overcome his free will. Cf. Cunningham v. Perez, 345 F.3d 802, 810-11 (9th Cir. 2003), cert. denied, 541 U.S. 1010 (2004) (officer did not undermine plaintiff's free will where interrogation lasted for eight hours and officer did not refuse to give break for food and water, officer suggested cooperation could lead to treatment rather than prison, officer made statement he had put people in prison for similar conduct, officer denied plaintiff's request to call therapist, and plaintiff diagnosed with mental disorder and taking bi-polar medication); Clark v. Murphy, 331 F.3d 1062, 1073 (9th Cir.), cert. denied, 540 U.S. 968 (2003) (state court's determination that interrogation was non-coercive, where suspect was interrogated over 5-hour period in 6 by 8 foot room without water or toilet (but never requested water or use of a toilet), was objectively reasonable application of Schneckloth).

      This court sees no pledge or suggestion of lenient treatment that would have overcome Esmay's will. Cf. United States v. Okafor, 285 F.3d 842, 846-47 (9th Cir.), cert. denied, 537 U.S. 989 (2002) (customs agent's statements to defendant that he would be subject to 10-20 years in prison and it would be to his benefit to cooperate with authorities, as well as customs agent's statement that he would let the government know if defendant cooperated, did not render subsequent confession involuntary). Esmay has not provided evidence to overcome the presumption of correctness that attaches to the state court's factual determination that there were no implied promises of leniency.

7

The absence of a written Miranda waiver is of no consequence because Esmay admits that he did receive verbal Miranda warnings before confessing. RT 48, 57. His argument that the unrecorded part of the interview made the interview coercive was implicitly rejected by the state court and this court sees no reason to rule otherwise. Esmay was a seasoned player in the criminal justice system, and there is no doubt that the "sweet talking" that he alleges took place did not overcome his free will. He had many times before been tempted by police officers to waive his Miranda rights and had only done so once, and that was about 18 years earlier. RT 48.

Considering the totality of the circumstances, the court concludes that the police did not obtain Esmay's statements by coercion or improper inducement that prevailed over his free will. The state court's rejection of his claim was not contrary to or an unreasonable application of clearly established federal law. Esmay is not entitled to the writ on this claim.

B.      Right To Testify

Esmay claims that his attorney denied him his right to testify. On a related note, he urges that the trial court applied the wrong standard in judging his motion under People v. Marsden, 2 Cal. 3d 118 (Cal. 1970), in which – months after the verdict was entered -- he claimed a conflict with his appointed attorney based on her refusal to let him testify. (He also asserted other grounds in his Marsden motion but did not pursue them.) The trial court heard from defense counsel and Esmay on the alleged refusal to let Esmay testify and then denied the Marsden motion.

Before analyzing the constitutional claim, it is necessary to clarify what the claim is and isn't. The problem was presented to the trial court as a claim within a claim, i.e., Esmay filed a Marsden motion to get new counsel on the ground that there was an irreconcilable conflict because counsel had refused to let him testify. Had the Marsden motion been granted, that alone could not have undone the alleged denial of the right to testify because Esmay didn't make the motion until more than two months after the verdict was announced. Additionally, the trial court's alleged failure to apply the correct standard in evaluating the Marsden motion is largely beside the point because it would be a state law error for which

8

federal habeas relief is not available.  See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  The federal constitutional claim presented in the federal habeas petition and in the petition for review in the California Supreme Court was for a denial of the constitutional right to testify.  The claim was not cast in either petition as a Sixth Amendment ineffective assistance of counsel claim, even though respondent in his answer and petitioner in his traverse focused on the assistance of counsel aspect.  This court focuses on the right to testify, even though the evidence was presented in the context of a Marsden motion.

At the Marsden hearing, defense counsel agreed that she "did fail to call him to testify, and there were a number of reasons for that." RT 466.  She explained:

> One was that I had talked with Charlie – and I call him "Charlie," at his own request – in the jail.  And we both had agreed that he pretty much said everything that there was to be said about the robbery when he gave an interview with C.H.P. before the trial had even started.  And if there was anything else to be said – there really wasn't anything else he could say because it was all on tape.
>
> Now, Charlie knows that he has the right to testify.  We went through a hearing before the trial started on what would be used if he took the stand.  The Court ruled on a number of impeachable priors.
>
> And I said to Charlie, "If you take the stand, the only thing that's going to come out of it, because they are going to play the tape anyway, is that all your priors are going to come in.  The jury is not going to believe anything you say now that contradicts what you said then."
>
> Now, if, in spite of that, Charlie had wanted to take the stand, all he needed to do was tell me loud and clear; because I know that he absolutely has the right to testify at his own trial, and I would not be such a fool as to turn a man down who wants to take his chance on the stand at a trial.  But he never said that to me.  And right before I closed, I turned to him and said, "I'm done."  And then I rested.
>
> So yes, I failed to put him on the stand, but I know better.  If he had just said to me, "I want to do this.  I know what the situation is.  I don't care," I would have put him on.  But I need him to tell me that.
>
> And all the discussions we had before that led me to believe that he understood that what we were doing at the trial was we were challenging the prosecution to see if they could put it together.  And that's what we were doing.

RT 466-467.

Esmay responded at the Marsden hearing: "Ms. Hayes says that she didn't want to call me to the stand because my past record could impeach my statement.  I never denied the robbery.  They're using the robbery to try to make me a liar about being convicted on a

9

robbery. I've never denied the robbery since day one. And to just have that kind of excuse to not allow me to testify doesn't even make sense to me. And she never conferred with me whatsoever whether I wanted to testify since our last – like I said in the – like I got written down there." RT 471.

The court then observed: "As far as your not testifying, to be quite honest with you, it was a tactical decision, I think, on Ms. Hayes' part. I think it's an appropriate decision. I can see why it was made. One of the issues was whether or not you were armed and whether or not you were involved in the robbery I think. [¶] And even though there were statements on the videotape by you that the jury heard, there was still a lot of examination and cross-examination about – from the victims about the gun, what it looked like, what it appeared to them to be, and so on. And you getting up there and testifying to something different and then being impeached with your prior record, I think Ms. Hayes tactically did the right thing." RT 473.

The California Court of Appeal rejected the claim that the Marsden motion had been decided incorrectly. The court explained that under state law, the onus was on a criminal defendant to speak up at trial if he wanted to testify, Cal. Ct. App. Opinion, p. 14, and state law did not require the trial court to obtain an affirmative waiver from a defendant of his right to testify. The right to testify is subject to the condition that the defendant must timely assert that right and, without such an assertion, "'a trial judge may safely assume that a defendant who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy.'" Cal. Ct. App. Opinion, p. 14 (citation omitted).

> Here, defendant did not inform the court, during trial, that he desired to testify. He waited until the jury had convicted him before raising the issue in a Marsden motion. Defendant's prior Marsden motion demonstrates he knew he could apprise the trial court of a conflict with counsel. [¶] It appears from the record that the trial court simply determined that defendant's claim of wanting to testify was not credible, and that defendant had in fact acquiesced in counsel's advice that it would be a better strategy for defendant not to testify. Under the circumstances, the trial court did not err by denying defendant's Marsden motion or by failing to treat the motion as a motion for a new trial.

Cal. Ct. App. Opinion, p. 14.

A criminal defendant has a fundamental right to testify in his own behalf, see Rock v. Arkansas, 483 U.S. 44, 51-53 (1987). The right that "stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination." United States v. Pino-Noriega, 189 F.3d 1089, 1094 (9th Cir.), cert. denied, 528 U.S. 989 (1999). Like the California court, the Ninth Circuit has taken the view that the defendant needs to speak up at the appropriate time or is deemed to have waived his right to testify. Waiver of the right may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so. See United States v. Joelson, 7 F.3d 174, 177 (9th Cir.), cert. denied, 510 U.S. 1019 (1993). A defendant who wants to reject his attorney's advice and take the stand may do so by insisting on testifying, speaking to the court or discharging his lawyer. See id. A defendant waives the right to testify if he remains silent in the face of his attorney's decision not to call him as a witness. See Pino-Noriega, 189 F.3d at 1094-95 (demand to testify untimely where defendant did not ask to testify until after the jury reached a verdict but before the verdict was announced). Esmay has not identified any Supreme Court authority that grants a right to testify where the defendant has waited until after the verdict comes in before announcing his desire to testify.

Esmay contends that the California court of appeal was wrong in interpreting the trial court's comments to mean that it had denied the motion because he had not made a timely demand to testify; he asserts the court of appeal's "decision is directly contrary to the court's statement, which made no mention whatsoever about credibility or timeliness." Petition, p. 18. Although Esmay is correct in that the trial court did not explicitly make factual findings that he had not made a timely demand to testify or that it found counsel credible and him not credible, those findings were implicit in the court's decision.

Esmay's right to testify was not denied. First, Esmay never told the court during the trial that he wanted to testify. He didn't raise the problem until his Marsden motion was filed months after the verdict was announced. Second, Esmay was an experienced criminal

11

defendant who knew how to complain about counsel's performance if he wanted to, as evidenced by his earlier <u>Marsden</u> motions. This supports a determination that he knew at the time of trial that he could have promptly complained if he actually wanted to testify and counsel refused to let him. Third, the record amply supports the conclusion that Esmay was going along with counsel's advice that it would be a better strategy for him not to testify. Esmay's unfinished sentence at the <u>Marsden</u> hearing – "she never conferred with me whatsoever whether I wanted to testify <u>since our last –</u> " indicates that at some point he and counsel did discuss whether he should testify. Fourth, Esmay does not contend that he actually asked counsel after the prosecution rested to let him testify; his contention is more that she rested without consultation with him at that moment. Both Esmay and defense counsel agree that they did not confer at the very moment counsel chose to rest the defense, but the failure to consult at that moment does not establish a constitutional violation under the circumstances. At trial, Esmay's attorney pursued a strategy that was based on him not testifying, but did so after consultation with him. Any advice that he not testify did not bar him from exercising his constitutional right to testify. Fifth, Esmay provided no evidence that he was unaware of his right to testify during the trial. Esmay has not shown that the state court's rejection of his claim that counsel prevented him from testifying was contrary to or an unreasonable application of clearly established Supreme Court authority. He is not entitled to the writ on this claim.

Even if the claim had been presented as one for ineffective assistance of counsel, it would fail because there was no deficient performance by counsel or resulting prejudice. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Trial counsel's advice to Esmay to not testify was based on her view that Esmay would not be helping his cause because his videotaped interview that came in at trial already told the full story and his prior criminal record – which was more extensive and damaging than the generic information that was available to the jury with him not testifying – was going to undermine any testimony by him that contradicted his interview statements. <u>Compare</u> RT 376 (stipulation that Esmay had been "convicted of a felony offense within the meaning of" Penal Code § 12021.1(b)) <u>with</u>

12

1 CT 299-305 (Esmay's rap sheet).  Her recommendation was an informed strategic decision to
2 which substantial deference is owed.  Counsel's decision to encourage Esmay not to testify
3 was objectively reasonable, given the entirety of the circumstances.  Having made that
4 tactical decision early on after consultation with the client, it was not deficient performance
5 to not double-check whether he wanted to stay the course before she rested the defense.

C.      Apprendi Claims

      1.      Upper Term Sentence For Robbery Conviction

           a.      Background

Esmay argues that the imposition of the upper term sentence for the robbery conviction violated his rights under Blakely.  The conviction of second degree robbery in count 1 was punishable by 2, 3 or 5 years in prison.  See Cal. Penal Code § 213(a)(12).  The trial judge selected the upper term of 5 years as the base term.  The judge did not discuss the circumstances and instead explained the upper term sentence by reference to sub-sections of the applicable rule: "Under California Rule of Court 4.421, circumstances in aggravation, the Court finds as unfavorable (a)(8), (a)(9), (b)(1), (b)(2), (b)(3), (b)(4), (b)(5)."  RT 481.  The court did not find any circumstances in mitigation.

The California Court of Appeal rejected the claim that the sentence was unconstitutional.  The court explained that, if Blakely applied to California's sentencing scheme, Esmay's criminal record justified the imposition of the upper term.  The court correctly noted that Blakely does not apply when the fact of a prior conviction is used as a fact to increase the penalty beyond the statutory maximum.  Cal. Ct. App. Opinion, p. 18.  The appellate court noted that among the circumstances in aggravation that the trial court relied on to choose the upper term sentence were "the fact that defendant had prior convictions that were numerous or of increasing seriousness, the fact that he had served a prior prison term, and the fact that he was on probation or parole at the time of the crime."  Id.  The appellate court saw these factors in aggravation as analogous to the fact of a prior conviction, as to which a jury right did not attach, and explained that as long as a single aggravating factor was sufficient to justify the imposition of an upper term, the "trial court

13

1  could properly rely on any one of these circumstances to impose the upper term without a
2  jury finding." Id. at 18.
3              b.      Federal Constitutional Law
4       The Sixth Amendment to the United States Constitution guarantees a criminal
5  defendant the right to a trial by jury.  U.S. Const. amend. VI.  This right to a jury trial has
6  been made applicable to state criminal proceedings via the Fourteenth Amendment.  Duncan
7  v. Louisiana, 391 U.S. 145, 149-50 (1968).  The Supreme Court's Sixth Amendment
8  jurisprudence was significantly expanded by Apprendi v. New Jersey, 530 U.S. 466 (2000),
9  and its progeny, which extended a defendant's right to trial by jury to the fact finding used to
10 make enhanced sentencing determinations as well as the actual elements of the crime.  "Other
11 than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the
12 prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable
13 doubt." Apprendi, 530 U.S. at 488-90.  The "statutory maximum" for Apprendi purposes is
14 the maximum sentence a judge could impose based solely on the facts reflected in the jury
15 verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the
16 sentence the judge could impose after finding additional facts, but rather is the maximum he
17 or she could impose without any additional findings.  Blakely v. Washington, 542 U.S. 296,
18 303-04  (2004).  The Court reaffirmed this basic principle when it determined that the federal
19 sentencing guidelines violated the Sixth Amendment because they imposed mandatory
20 sentencing ranges based on factual findings made by the sentencing court.  See United States
21 v. Booker, 543 U.S. 220, 233-38 (2005).  The sentencing guidelines were unconstitutional
22 because they required the court to impose an enhanced sentence based on factual
23 determinations not made by the jury beyond a reasonable doubt.  Id. at 243-245.
24      In Cunningham v. California, 127 S. Ct. 856 (2007), the Court held that California's
25 determinate sentencing law ("DSL") violated the Sixth Amendment because it allowed the
26 sentencing court to impose an elevated sentence based on aggravating facts that it found to
27 exist by a preponderance of the evidence.  Id. at 860, 870-71.  The sentencing court was
28 directed under the DSL to start with a "middle term" and then move to an "upper term" only

if it found aggravating factual circumstances beyond the elements of the charged offense. Id. at 862. Concluding that the middle term was the relevant statutory maximum, and noting that aggravating facts were found by a judge and not the jury, the Supreme Court held that the California sentencing law violated the rule set out in Apprendi. Id. at 871. Although the DSL gave judges broad discretion to identify aggravating factors, this discretion did not make the upper term the statutory maximum because the jury verdict alone did not authorize the sentence and judges did not have the discretion to choose the upper term unless it was justified by additional facts. Id. at 868-69.

Cunningham had not yet been decided when Esmay's conviction became final. There thus is a serious question whether retroactive application of it would violate Teague v. Lane, 489 U.S. 288 (1989). The court need not address the unbriefed Teague issue because, regardless of whether Cunningham applies, any Apprendi error that occurred was harmless.

        c.      Harmless Error

An Apprendi error is subject to harmless error analysis. See Washington v. Recuenco, 126 S. Ct. 2546 (2006). The proper framework for the harmless error analysis is found in Neder v. United States, 527 U.S. 1 (1999). See Recuenco, 126 S. Ct. at 2551-53; United States v. Zepeda-Martinez, 470 F.3d 909, 910 (9th Cir. 2006):

> Under Recuenco and Neder, an error is harmless if the court finds beyond a reasonable doubt that the result "would have been the same absent the error." Neder, 527 U.S. at 19. Neder explained that where the record contains "overwhelming" and "uncontroverted" evidence supporting an element of the crime, the error is harmless. id. at 17, 18. Conversely, the error is not harmless if "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding." Id. at 19.

Zepeda-Martinez, 470 F.3d at 913 (parallel citations omitted). Zepeda-Martinez and Neder were direct appeal cases and therefore articulated a standard slightly differently than that applicable in a habeas action where relief is not available unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Regardless of whether this court must find that the error did not result in actual prejudice or must find beyond a reasonable doubt that the result would have been the same

15

absent the error, the requisite level of certainty easily exists in Esmay's case.

Under the framework identified in Neder and Zepeda-Martinez, this court looks at the record to consider the state of the evidence in support of the sentencing factor to determine whether the error was harmless. The probation report and the rap sheet showed that Esmay had five felony convictions and 26 misdemeanor convictions, had been committed to the CYA as a teenager, and had received prison commitments in 1988, 1992 and 1996. See CT 274-322. His 1996 robbery conviction led to a 7-year sentence for which he was on parole when he committed the current offenses. CT 276. After being instructed that the parties had stipulated Esmay was previously convicted of a felony, the jury had implicitly found that he had suffered a prior felony conviction by finding him guilty of being a felon in possession of a firearm. See CT 215, 245. The record also included Esmay's motion to strike the prior convictions that described Esmay's lengthy criminal history and stays in jail and prison; that motion did not deny the history but instead attempted to explain it as the product of a long-term substance abuse problem. See CT 78–83.

A review of the record shows that the evidence was overwhelming and uncontroverted in support of several aggravating circumstances pertaining to the defendant on which the sentencing judge relied in selecting the upper term sentence for Esmay. Esmay argued in state court that the judge went beyond merely determining the existence of prior convictions in his findings that the aggravating circumstances in Rule 4.421(b) existed. However, the uncontroverted record of 5 felonies and 26 misdemeanor convictions provided adequate proof for the court to conclude that the aggravating circumstance of "numerous" convictions was present, see Rule 4.421(B)(2). The uncontroverted record that he had been to prison and was on parole when he committed the current crime provided adequate proof for the court to find that the aggravating circumstances in Rule 4.421(b)(3) and (4) were present. The sentencing judge's comments leave no doubt that he would have reached the same result if told his findings had to be based on proof beyond a reasonable doubt rather than on a preponderance of the evidence, as he saw many aggravating circumstances and no mitigating ones. Under California law, only one aggravating factor need be found to permit the upper

term sentence. See People v. Black, 41 Cal. 4th 799, 814-15 & n.4 (Cal. 2007). Esmay's lengthy criminal record was undisputed at trial, as was his status as a parolee at the time of the commission of the robbery. Either of these circumstances alone sufficed to permit an upper term sentence.

Although the state appellate court considered only the criminal history circumstances, two other circumstances bolster this court's view that any error was harmless. First, defense counsel conceded that the upper term was appropriate for the facts of the robbery. She argued that the court should impose the aggravated term on the robbery "based on what happened" and impose a consecutive sentence on only one of the several false imprisonment convictions with the other false imprisonment sentences to run concurrently. RT 477-478. Second, Esmay's handwritten letter to the sentencing judge provides overwhelming and uncontroverted evidence to support the aggravating circumstance under Rule 4.421(a)(8) ("The manner in which the crime was carried out indicates planning, sophistication, or professionalism.") Esmay wrote to the court: "I wish to express to the court that I took extra precautions to insure that no one was injured during the robbery itself. One such caution was that I was not under the influence of any drugs or alcohol so I could in fact maintain control of the situation. Another issue is my choice to use a 'simulated weapon' incapable of producing any harmful projectiles what-so-ever. It was only to frighten not injure." CT 326. The "precautions" he seemed to pride himself on taking also were admissions of planning. The court's determination that the aggravating circumstance of planning was present was clearly supported by the record.

This court finds beyond a reasonable doubt that the result, i.e., the imposition of the upper term, would have been the same absent any error. The court also finds that there was no actual prejudice to Esmay. The California Court of Appeal's rejection of the claim was not an unreasonable application of or contrary to clearly established Supreme Court authority. Esmay is not entitled to the writ on this claim.

### 2. The Consecutive Sentences Did Not Implicate The Apprendi Rule

Esmay argues that the trial court's determination that the false imprisonment sentences were to be served consecutively also violates the Apprendi rule. This claim fails to clear the hurdle posed by § 2254(d).

The Supreme Court's cases in the Apprendi line do not contain any indication that the holdings regarding jury trial rights and proof beyond a reasonable doubt apply to consecutive sentences. In fact, the signals from the Court are that the analysis is done one crime at a time and consecutive sentencing possibilities when multiple convictions for multiple crimes have occurred are irrelevant to the analysis. See Apprendi, 530 U.S. at 474; Blakely, 542 U.S. at 299 n.2; accord Black, 41 Cal. 4th at 820-83 (consecutive sentencing decision does not implicate the defendant's right to a jury trial). One case that might have prompted the Supreme Court to address the consecutive sentence question was dismissed because of a threshold procedural problem. See Burton v. Stewart, 127 S. Ct. 793 (2007) (petitioner's failure to obtain order authorizing him to file second petition deprived courts of jurisdiction to hear his claim challenging consecutive sentences). Esmay also has not identified any other United States Supreme Court determination that the holdings in the Apprendi line apply to consecutive sentences. Because there is no "clearly established" Supreme Court authority applying Apprendi and its Supreme Court progeny to consecutive sentences, the state appellate court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Habeas relief cannot be granted on this claim.

## CONCLUSION

The petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 22, 2007

Marilyn Hall Patel
United States District Judge